# In the United States Court of Federal Claims

No. 14-388L
(Filed: April 8, 2021)

```
*************************************
WILLIAM C. HARDY & BERTIE ANN        *
HARDY et al.,                        *
                                     *
              Plaintiffs,            *
                                     *   RCFC 56; Cross-Motions for Summary
      v.                             *   Judgment; Rails-to-Trails; Vacatur and
                                     *   Remand from Federal Circuit; Causation
THE UNITED STATES,                   *
                                     *
              Defendant.             *
*************************************
```

Elizabeth A. Gepford McCulley, Kansas City, MO, for plaintiffs.

David A. Harrington, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

In this rails-to-trails action, plaintiffs contend that they own real property adjacent to a rail corridor in Newton County, Georgia. They assert that the Central of Georgia Railroad Company ("CGA") and its predecessors held easements for railroad purposes that crossed their land.[1] According to plaintiffs, defendant then authorized the conversion of the railroad rights-of-way into recreational trails pursuant to the National Trail Systems Act ("Trails Act"), conduct that resulted in a taking in violation of the Just Compensation Clause of the Fifth Amendment to the United States Constitution.

In a prior decision, the court held that defendant was liable for a taking with respect to eleven parcels located east of milepost 65.80 ("MP-65.80"). See Pls.' Ex. B, ECF No. 230-2. On appeal, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") vacated that holding and remanded the claims for further consideration in light of its then-recent decision in Caquelin v. United States, 959 F.3d 1360 (Fed. Cir. 2020). Before the court are the parties' cross-motions for summary judgment regarding liability for a temporary taking of the MP-65.80 parcels. The court concludes that defendant is not liable for any taking of these parcels, as explained below. Thus, it grants defendant's motion and denies plaintiffs' motion.

---

[1] The modern-day CGA is the successor in interest to the Middle Georgia and Atlantic Railway Company, which originally acquired the land at issue in this action.

## I. BACKGROUND

### A. Factual History

The history of this dispute has been extensively chronicled in this court's past decisions and will not be repeated in full. See Hardy v. United States ("Hardy III"), 131 Fed. Cl. 534, 535-37 (2017). Of particular relevance here, CGA filed a verified Notice of Exemption with the United States Surface Transportation Board ("Surface Transportation Board") on July 1, 2013. Central of Georgia Railroad Company–Abandonment Exemption–in Newton County, Ga., 78 Fed. Reg. 43,273 (July 19, 2013); see also Corletto Decl. ¶ 4. In this notice, CGA requested authority to abandon "approximately 14.90 miles of rail line between milepost E 65.80 (at the point of the line's crossing of Route 229 in Newborn) and milepost E 80.70 (near the intersection of Washington Street SW., and Turner Lake Road SW., in Covington), in Newton County, Ga." 78 Fed. Reg. at 43,273. The notice was accompanied by a map of the rail line, which depicted MP-65.80 as being located in Newborn, as the description indicated. Pls.' Ex. A at 12, ECF No. 103-1. When the Surface Transportation Board issued the Notice of Interim Trail Use or Abandonment ("NITU") on August 19, 2013, it copied this description of MP-65.80 verbatim. Cent. of Ga. R.R. Co.–Abandonment Exemption–in Newton Cnty., Ga., No. AB 290 (Sub-No. 343X), 2013 WL 4425647 (S.T.B. Aug. 19, 2013).

However, CGA subsequently determined that the Notice of Exemption and NITU contained an error—specifically, that MP-65.80 is not located at "the point of the line's crossing of Route 229 in Newborn" as it had first stated. Corletto Decl. ¶ 5. Instead, the descriptive parenthetical should have indicated that the milepost is located at "a point just east of the Ziegler Road crossing west of downtown Newborn." Id. ¶ 7. CGA notified the Surface Transportation Board of this mistake on October 14, 2016:

> To be clear, the mileposts listed in the Notice are, and remain, correct. The total length of the line of approximately 14.90 miles is unchanged, as are the zip codes and other relevant information. The only mistake was the location point on the map attached to the Notice and the parenthetical references to milepost E-65.80.

Def.'s App. A at 2, ECF No. 96-1. The Surface Transportation Board issued a public notice regarding its correction of the NITU on November 18, 2016. Cent. of Ga. R.R. Co.—Abandonment Exemption—in Newton Cnty., Ga., No. AB 290 (Sub-No. 343X), 2016 WL 6839539, at *1-2 (S.T.B. Nov. 18, 2016). The eleven parcels at issue are adjacent to the rail line between the location of MP-65.80 described in the original NITU and the location of MP-65.80 described in the corrected NITU.

To explain the confusion created by the contradictory description of MP-65.80's location, defendant offers the declaration of Jacqueline Decker Corletto, Assistant Vice President of Strategic Planning and former Director of Strategic Planning for Norfolk Southern Corporation.[2]

---

[2] CGA is a wholly owned subsidiary of Norfolk Southern Corporation. Corletto Dep. 4:16-5:5, Feb. 21, 2017 ("Corletto 2017 Dep.").

Corletto Decl. ¶ 1. Among other responsibilities, Ms. Corletto was tasked with "evaluating the reach of [CGA's] network including the profitability and capacity of [CGA's] lines" and "evaluating whether certain lines may be candidates for discontinuation of service or abandonment." Id. ¶ 2. She states that CGA "was not seeking authority to abandon the railroad corridor east of MP 65.80 (or its own real property rights in the corridor east of MP 65.80) when it filed its Notice of Exemption with the [Surface Transportation Board] or when the NITU was subsequently issued by the [Surface Transportation Board]." Id. ¶ 8. She similarly avers that CGA "did not intend to abandon the rail line east of MP 65.80 or any easements that it possessed over and across land east of MP 65.80, and [CGA] would not have abandoned that portion of the line in the absence of the NITU." Id. ¶ 9; accord Corletto 2017 Dep. 19:8-21.

Ms. Corletto further indicates that "the railroad corridor east of MP 65.80 . . . has at all pertinent times . . . been the subject of an active lease to a third party." Corletto Decl. ¶ 10. In April 2008, CGA agreed to lease this portion of its line to Squaw Creek Southern Railroad ("SCS"), a Class III rail carrier. Squaw Creek Southern Railroad, Inc.–Lease & Operation Exemption–Central of Georgia Railroad Company, 74 Fed. Reg. 47,855 (Sept. 17, 2009); Corletto 2017 Dep. 14:9-20. CGA changed operators from SCS to CaterParrott Railnet, LLC ("CaterParrott"), another Class III rail carrier, in 2013.[3] CaterParrott Railnet, LLC–Change in Operators Exemption–Rail Lines of Central of Georgia Railroad Company, 78 Fed. Reg. 75,959 (Dec. 13, 2013). CaterParrott's Change in Operators Exemption, filed with the Surface Transportation Board on November 29, 2013, correctly described the location of MP-65.80. Parrott Dep. Ex. 2. CaterParrott began discussing a potential lease with CGA between April and July 2013, and the lease was entered into in October 2013. Parrott Dep. 17:9-18, 18:13-25; see also Corletto 2017 Dep. 23:7-11 (indicating that negotiations between CGA and CaterParrott began in the summer of 2013). CaterParrott's lease began on January 1, 2014, once the Surface Transportation Board's customary notice period had expired. Parrott Dep. 21:11-21. CaterParrott's lease expires in 2023. Corletto 2017 Dep. 24:14-16.

Christopher Parrott, co-CEO of CaterParrott, characterized the condition of the disputed portion of rail line as "active" and, based on Federal Railroad Administration standards, in "accepted status."[4] Parrott Dep. 24:23-25:19, 26:6-27:3. Once the lease began, CaterParrott did "an extensive amount of work" on the track. Id. at 21:22-22:5. It spent over $500,000 for work such as "crosstie replacement, rock[] clearing, vegetation control, [and] right-of-way work." Id. at 22:10-13. CaterParrott stored cars on the line for one of its customers, and it anticipated adding a new customer in the near future. Id. at 22:14-23.

---

[3] CGA indicated that SCS requested that the lease be discontinued due to lack of profitability. Corletto 2017 Dep. 15:15-16:1.

[4] Mr. Parrott elaborated: "You could run [slow moving trains] on an accepted track, but you need to know it is going to require work. It is at the stage where it will fundamentally need work soon." Parrott Dep. 25:16-19.

As of 2017, railroad cars were not currently running over the line east of MP-65.80. Id. at 23:7-15. Certain cities along the line, including Newborn, had been granted permission to pave over some of the railroad crossings with asphalt, with the understanding that the asphalt would be removed if the railroad so required. Id. at 23:15-23. Because of the asphalt, CaterParrott had not run trains over the line, although "other track equipment" was sometimes used on the line.[5] Id. at 27:7-12. In fact, in 2017, the city of Newborn was in the process of removing the asphalt to allow use of the line. Id. at 23:15-24:4. Additionally, at some point in the fall of 2013, a contractor hired to remove certain portions of track mistakenly removed track east of MP-65.80. Corletto Dep. 60:3-8, Feb. 2, 2018 ("Corletto 2018 Dep."). Ultimately, "[w]hoever the operator was at the time had recognized it, [and] worked with [CGA] and the contractor to put it back within a month or two at the most."[6] Id. at 60:5-8.

### B. Procedural History

The court issued several decisions in this case prior to appeal. After an initial decision on partial summary judgment, Hardy v. United States ("Hardy I"), 127 Fed. Cl. 1 (2016), the court issued two decisions in response to the parties' motions for reconsideration, Hardy v. United States ("Hardy II"), 129 Fed. Cl. 513 (2016); Hardy III, 131 Fed. Cl. at 534. Then, after conducting a trial on damages, the court issued decisions regarding the proper interest rate, Hardy v. United States, 138 Fed. Cl. 344 (2018), and the amount of just compensation owed to plaintiffs, Hardy v. United States, 141 Fed. Cl. 1 (2018). Defendant appealed, asserting that the court erred by finding that (1) plaintiffs had a cognizable property interest in all of the parcels at issue and (2) the NITU effected a temporary taking of the MP-65.80 parcels. Hardy v. United States ("Hardy VI"), 965 F.3d 1338, 1341 (Fed. Cir. 2020).

After this court had issued all of its decisions, but before the appeal was resolved, the Federal Circuit issued its decision in Caquelin, 959 F.3d at 1360. In that rails-to-trails case, the Federal Circuit elaborated on the role a NITU plays in the accrual of a claim. Id. at 1370-72. Reviewing Caldwell v. United States, 391 F.3d 1226 (Fed. Cir. 2004), and its progeny, the court clarified that general causation principles must be applied to NITU-based takings. Caquelin, 959 F.3d at 1371. "It is a fundamental principle of takings law," the court observed, "that a government action is not a taking of property if, even in the absence of the challenged government action, the plaintiff would not have possessed the allegedly taken property interest." Id. Thus, the court concluded that "a NITU does not effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU . . . ." Id. at 1363.

---

[5] The other track equipment was further described as "high rail trucks" or "mobile-type machines" used to inspect the line. Parrott Dep. 27:18-28:2. This equipment generally rides on the rails themselves. Id. at 28:3-6.

[6] Ms. Corletto clarified that the track was relaid "by the time CaterParrott started up operations at the end of December [2013]." Corletto 2018 Dep. 61:10-18.

On July 15, 2020, the Federal Circuit issued its decision in this matter. Hardy VI, 965 F.3d at 1338. The Federal Circuit affirmed the court's interpretation of the disputed deeds, agreeing that plaintiffs had a cognizable property interest. Id. at 1344-49. However, the Federal Circuit vacated the court's conclusion that the NITU had resulted in a temporary taking of the MP-65.80 parcels. Id. at 1349-50. Concluding that the causation inquiry outlined in Caquelin was not adequately considered during the proceedings before this court, the Federal Circuit instructed this court to address the issue on remand. Id. at 1349. Agreeing that no further discovery was necessary, the parties fully briefed cross-motions for summary judgment. Neither party requested oral argument, and the court finds it unnecessary.

## II. STANDARDS FOR DECISION

### A. Motions for Summary Judgment

The parties cross-move for summary judgment on the issue of liability pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. at 324. Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1). Any affidavits or declarations used in this context "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." RCFC 56(c)(4).

### B. Vacatur and Remand

"[A] decision that has been vacated has no precedential authority whatsoever." Durning v. Citibank, N.A., 950 F.2d 1419, 1424 n.2 (9th Cir. 1991); see also 47 Am. Jur. 2d Judgments § 676 (2009) ("When a judgment has been rendered and later set aside or vacated, the matter stands precisely as if there had been no judgment."). Thus, a court whose judgment has been vacated remains "free to come to different factual conclusions the second time around without revisiting its decision in the earlier vacated decision." Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1332 (Fed. Cir. 2003); see also In re Joy Glob., Inc., 381 B.R. 603, 612 (D. Del. 2007) (noting that when an appellate court vacates a grant of summary judgment, "the situation is as if there were no prior proceedings" on summary judgment).

On remand, a trial court may not deviate from the appellate mandate. Banks v. United States, 741 F.3d 1268, 1276 (Fed. Cir. 2014). A trial court "is bound by [an appellate court's mandate] as the law of the case, and must carry it into execution according to the mandate. That court cannot vary it, or examine it for any other purpose than execution." In re Sanford Fork & Tool Co., 160 U.S. 247, 255 (1895); see also In re Chambers Dev. Co., 148 F.3d 214, 224 (3d Cir. 1998) (observing that disregard of appellate mandates "would severely jeopardize the supervisory role of the courts of appeals within the federal judicial system"). Both the court's formal judgment and the court's written opinion inform the trial court's interpretation of the appellate mandate. Sanford Fork & Tool Co., 160 U.S. at 256.

### III. DISCUSSION

#### A. The Parties' Contentions

Plaintiffs approach the Federal Circuit's ruling from two angles. First, plaintiffs oppose the Caquelin court's causation holding. Acknowledging that the Federal Circuit has instructed this court to apply this principle to the MP-65.80 parcels, they nonetheless assert that the holding "was both dicta and wrong." Pls.' Mot. 2. Second, plaintiffs maintain that even if the court takes causation into consideration, a temporary taking still occurred. Plaintiffs emphasize that the Notice of Exemption, the map accompanying the Notice of Exemption, the NITU, and similar filings all used the initial, uncorrected description of the location of MP-65.80. Id. at 9-11. As evidence that these filings accurately portrayed CGA's intent, plaintiffs point to the fact that rails and ties were indeed removed from the disputed section of the line. Id. at 9-11, 13.

Defendant, relying on Caquelin, begins by reiterating that "[c]ausation is an indispensable element that the plaintiff must prove in every takings case." Def.'s Mot. 4. After emphasizing its position that Caquelin is both binding precedent and fully harmonious with prior rails-to-trails jurisprudence, defendant focuses its attention on the milepost description found in the original NITU. Id. at 8. On this point, defendant asserts, "[CGA's] unequivocal statement . . . is dispositive." Id. Because CGA explicitly stated through Ms. Corletto's declaration that it would not have abandoned the disputed portion of the line in the absence of the NITU, defendant maintains that plaintiffs cannot establish causation. Id. at 8-11.

#### B. Abandonment of Easements Under Georgia Law

"[T]he Fifth Amendment taking, if any, under the Trails Act is accomplished when an NITU is issued and state law reversionary interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled." Caldwell, 391 F.3d at 1236; accord Caquelin, 959 F.3d at 1363. To evaluate those "state law revisionary interests that would otherwise take effect," the court turns to Georgia law. See Castillo v. United States, 952 F.3d 1311, 1319 (Fed. Cir. 2020) ("We analyze the property rights of the parties in a rails-to-trails case under the relevant state's law . . . ."). Georgia law "does not favor the extinguishment of easements." Whipple v. Hatcher, 658 S.E.2d 585, 586 (Ga. 2008). Rather than allowing an easement acquired by grant to be extinguished by nonuse alone, Georgia courts require "clear, unequivocal, and decisive evidence of an intent to abandon the easement." Id.; see also Gaston

v. Gainesville & Dahlonega Elec. Ry. Co., 48 S.E. 188, 189 (Ga. 1904) ("Abandonment is largely a question of intent."); Hardigree v. Hardigree, 262 S.E.2d 127, 128 (Ga. 1979) ("Where an easement of way has been acquired by grant, the doctrine of extinction by nonuser does not apply . . . ."); Atlanta, Birmingham & Atl. Ry. Co. v. Coffee Cnty., 110 S.E. 214, 216 (Ga. 1921) ("[T]o constitute abandonment of an easement acquired by grant acts must be shown of such an unequivocal nature as to indicate a clear intention to abandon, and that mere nonuser will not amount to abandonment . . . .").

To indicate abandonment, nonuse of an easement "must originate in, or be accompanied by, some unequivocal acts of the owners of the easements, inconsistent with the continued existence thereof, and showing an intent on their part of abandon them."[7] Tietjen v. Meldrim, 151 S.E. 349, 350 (Ga. 1930). Evidence that an easement holder has "exercised dominion" over an easement weighs against abandonment. See Sadler v. First Nat'l Bank of Baldwin Cnty., 475 S.E.2d 643, 645 (Ga. 1996). Courts have found evidence of such control in a variety of circumstances, including when an easement holder specifically noted obstructions to an easement in its rezoning plans, Sorrow v. 380 Properties, LLC, 840 S.E.2d 470, 473-74 (Ga. Ct. App. 2020); maintained parking facilities on the easement and landscaped it, Sadler, 475 S.E.2d at 645; or spent money improving the easement and used it for vehicle ingress and egress, Sermons, 746 S.E.2d at 599-600.

### C. Analysis

#### 1. This Court Is Bound by Both Caquelin and Hardy VI

Little need be said to address plaintiffs' objections to the Caquelin holding. "[T]he Court of Federal Claims may not deviate from the precedent of the [Federal Circuit] any more than the Federal Circuit can deviate from the precedent of the United States Supreme Court." Crowley v. United States, 398 F.3d 1329, 1335 (Fed. Cir. 2005). Similarly, the court is not free to disregard the Federal Circuit's explicit appellate mandate by declining to apply the Caquelin holding in this case. Despite acknowledging these constraints, plaintiffs rely conspicuously on the court's

---

[7] "An easement may be lost by abandonment or forfeited by nonuse if the abandonment or nonuse continues for a term sufficient to raise the presumption of release or abandonment." Ga. Code § 44-9-6. Thus, when an easement has remained unused for twenty years, "a presumption, though not a conclusive one, of extinguishment" is sometimes recognized. Gilbert v. Reynolds, 212 S.E.2d 332, 335 (Ga. 1975) (quoting Kelsoe v. Oglethorpe, 48 S.E. 366, 368 (Ga. 1904)); accord Duffy St. S.R.O., Inc. v. Mobley, 471 S.E.2d 507, 508 (Ga. 1996). Georgia courts have not uniformly acknowledged this presumption. See Sermons v. Agasarkisian, 746 S.E.2d 596, 599 (Ga. Ct. App. 2013) (observing that "there appears to be some conflict in the Supreme Court of Georgia's authority on whether an express easement may be abandoned by non-use for a period of 20 years"). In Church of the Nativity v. Whitener, for instance, the court declined to find that an express easement unused for twenty-four years had been abandoned "in the absence of other evidence of an intent to abandon." 547 S.E.2d 587, 591 (Ga. Ct. App. 2001). More recently, in Brown v. Sapp, the court was presented with evidence that the easement had not been used in over forty-four years and called this "evidence of mere nonuse, not intent to abandon." 829 S.E.2d 169, 171 (Ga. Ct. App. 2019).

past decisions in this matter.  See Pls.' Mot. 12 (quoting Hardy III, 131 Fed. Cl. at 537-39); Pls.' Resp. 3 (quoting Hardy I, 127 Fed. Cl. at 22 n.5), 4 (quoting Hardy I, 127 Fed. Cl. at 21-22), 5-6 (quoting Hardy III, 131 Fed. Cl. at 538-39), 7 (quoting Hardy III, 131 Fed. Cl. at 537 n.4).

In its previous decisions, this court was guided by its understanding that "a NITU renders moot the issue of the railroad's intent regarding abandonment."  Hardy III, 131 Fed. Cl. at 538 n.6.  However, the Federal Circuit's Caquelin holding has since provided pivotal clarification regarding the role a NITU plays in categorical physical takings.  Although some portions of Hardy I and Hardy III quoted by plaintiffs may still be relevant "where no party has pointed to any legally material difference between the NITU date of issuance . . . and a date of abandonment in the but-for world in which there was no NITU," see Caquelin, 959 F.3d at 1372, the court must reevaluate them completely in this context.  Thus, plaintiffs' reliance on Hardy I and Hardy III is unpersuasive.  To the extent that any of this court's past pronouncements conflict with the Federal Circuit's Caquelin holding, the court disregards them.

### 2. But for the NITU, CGA Would Not Have Abandoned the Line East of MP-65.80

In Caquelin, the Federal Circuit emphasized that the government in that case had not "point[ed] to any evidence at all affirmatively indicating that the railroad would have delayed abandonment past [the issuance of the NITU]."  959 F.3d at 1373.  Such is not the case here.[8] This case presents the apparently rare situation in which the Notice of Exemption and NITU, documents that would suggest an intent to abandon in most cases, are actively contradicted by other evidence.  The court considers three such categories of evidence in reaching its decision: Surface Transportation Board filings, CGA's explanation of its intent, and CGA's actions.

#### a. Surface Transportation Board Filings

The evidence demonstrates that the location of MP-65.80 was indeed described incorrectly in the Notice of Exemption and other Surface Transportation Board filings.  CGA's Notice and related filings provided one location for this milepost, while documents related to CaterParrott's lease provided another.  When eventually presented with the contradiction, CGA took a closer look and corrected the error.  And plaintiffs, for their part, provide no evidence that MP-65.80 was in fact located where the original description placed it.

Still, plaintiffs seem reluctant to acknowledge the mistake.  E.g., Pls.' Mot. 13 (characterizing the corrected Notice of Exemption as evidence that CGA had "changed its mind" regarding the section to be abandoned); Pls.' Resp. 1 ("[T]he government's entire argument is based on the totally false premise that there was a mistake concerning the description of the eastern endpoint of the rail line . . . ."), 3 (referring to "the purported mistake in the NITU, which does not even exist").  But Surface Transportation Board filings are not infallible.  E.g., Lake

---

[8] Nor was it the situation in Loveridge v. United States, 149 Fed. Cl. 64, 71-72 (2020), a case upon which plaintiffs rely.  See Pls.' Resp. 8 n.14.  The court there explicitly noted that, as in Caquelin, no evidence suggested that the railroad would have delayed abandonment in the absence of the NITU.  Loveridge, 149 Fed. Cl. at 71-72 (quoting Caquelin, 959 F.3d at 1373).

State Ry. Co.–Abandonment Exemption–in Alpena & Presque Isle Cntys., Mich., No. AB 534 (Sub-No. 2x), 2004 WL 865979 (S.T.B. Apr. 20, 2004) (noting that the railroad's petition for exemption had identified the line's end point incorrectly and revising the line description); Atchison, Topeka & Santa Fe Ry. Co.–Abandonment Exemption–in Sedgwick Cnty., Kan., No. AB 52 (Sub-No. 60X), 1990 WL 287845 (S.T.B. Sept. 17, 1990) (same). Not only do such errors lie thoroughly within the realm of possibility, but the idea that such an error might be carried over into subsequent documents is certainly not astounding. See, e.g., Woodies Holdings, LLC v. United States, 143 Fed. Cl. 485, 496-97 (2019) (square footage error in General Services Administration lease "cut and pasted" into three additional leases); United States v. Brune, No. 19-11360, 2021 WL 1085805, at *1 (5th Cir. Mar. 22, 2021) (statutory subparagraph erroneously cited in charging documents copied into court's order). The court does not view CGA's initial mistake as determinative on the question of intent, and it does not view each filing repeating the mistaken description as independent evidence of intent.

### b. CGA's Explanation of Its Intent

For a more robust understanding of the relationship between CGA's Surface Transportation Board filings and its intent, the court looks to CGA's own explanation. Ms. Corletto's statements are decidedly relevant here. See Fed. R. Evid. 401 ("Evidence is relevant if . . . it has a tendency to make a fact [of consequence] more or less probable than it would be without the evidence . . . ."). Speaking on behalf of CGA, both during her depositions and in her 2020 declaration, Ms. Corletto repeatedly and consistently maintained that CGA did not intend at any point to abandon the line east of MP-65.80. Other courts have found similar evidence of the railroad's intent instructive. In Birt v. Surface Transportation Board, for instance, the court sought evidence of a railroad's intent to abandon a portion of its line. 90 F.3d 580 (D.C. Cir. 1996). Although the court observed that the railroad had twice referred to a line as "abandoned" in correspondence with both the Interstate Commerce Commission and a landowner,[9] the court ultimately credited the railroad's "subsequent explanation" that clarified its previous statements and expressed the railroad's desire not to abandon the line. Id. at 586-88. Much as the court did in that case, this court finds CGA's subsequent explanation persuasive.

Plaintiffs, in contrast, question the probative value of Ms. Corletto's declaration. Plaintiffs do not contest that declarations and other forms of testimony may be relevant in some cases; in fact, plaintiffs approvingly note the use of such evidence in another rails-to-trails case to discern railroad intent. See Pls.' Mot. 8 (noting that this court's decision in Memmer v. United States, 150 Fed. Cl. 706, 748 (2020), considered "the testimony from the railroad itself that it intended to abandon the right-of-way during the period of time that the NITU was in effect"). Plaintiffs also do not argue that the declaration contains improper legal conclusions, contains statements made without personal knowledge by the author, lacks foundation, or is otherwise inadmissible. Rather, plaintiffs characterize the declaration as "self-serving" and emphasize that it was written "8 years after the fact." Pls.' Resp. 11-12.

---

[9] The Interstate Commerce Commission was the predecessor of the Surface Transportation Board. 49 U.S.C. § 1302.

This is not a situation where a defendant agency has submitted a declaration or affidavit as an after-the-fact rationalization for the very activity that has brought it before the court. See, e.g., Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) (contrasting counsel's after-the-fact rationalizations for agency action with the "basis articulated in the order by the agency itself"); David S. Black & Gregory R. Hallmark, Procedural Approaches to Filling Gaps in the Administrative Record in Bid Protests Before the U.S. Court of Federal Claims, 43 Pub. Cont. L.J. 213, 252 (2014) ("Faced with a legal attack on the propriety of his decision, an agency official's natural inclination may be to doggedly defend the decision, rather than to engage in an open and honest exploration of his rationale."). CGA is not a party to this case and would not be responsible for paying any damages should the court reject defendant's position. See Molina Healthcare of Ca., Inc. v. United States, 133 Fed. Cl. 14, 35 (2017) ("By an act of Congress, the Judgment Fund is the source from which judgments from [the United States Court of Federal Claims] will be paid."); accord 31 U.S.C. § 1304; 28 U.S.C. § 2517. One could just as easily argue that a truly "self-serving" response would have been for CGA to preserve its reputation by pretending that it had made no mistake in the first place. Similarly, the court finds no merit in plaintiffs' concern that the declaration was written "8 years after the fact." See Pls.' Resp. 11. As plaintiffs themselves observe, some issues now relevant post-Caquelin were not explored earlier "because it was not anticipated that it was even going to be necessary." Pls.' Mot. 10. Moreover, Ms. Corletto previously discussed the alleged abandonment of the disputed portion of line during a deposition taken over three years earlier on February 21, 2017; her answers there are consistent with her later declaration. See Corletto 2017 Dep. 9:11-10:9, 19:8-21. Plaintiffs thus give the court no reason to doubt that Ms. Corletto's statements accurately reflect CGA's intent.

### c. CGA's Actions

CGA demonstrated its intent to maintain control over this section of line not just with words, but with actions. Although CGA's lease to SCS ended in 2013, it sought a new operator for the disputed portion of line. The court finds it unlikely that CGA would have begun negotiations with CaterParrott in the summer of 2013 for a decade-long lease while simultaneously petitioning the Surface Transportation Board to abandon the same track. CaterParrott, in turn, invested considerable money in the line's maintenance, negotiated with local municipalities to remove asphalt from the railroad crossings, and brought on new customers. None of this behavior provides the "clear, unequivocal, and decisive evidence of an intent to abandon the easement" required by Georgia courts. See Whipple, 658 S.E.2d at 586. To the contrary, the time, effort, and financial resources invested in the track at issue demonstrate CGA's dominion and control over that portion of the rail line.

As alleged evidence of abandonment, plaintiffs emphasize the temporary removal of certain portions of track, Pls.' Mot. 9-11, Pls.' Resp. 3, 7, 10-12, and the paving of certain crossings, Pls.' Mot. 11. This emphasis is misplaced. Neither removal of the track nor the paving of the crossings was permanent. As Ms. Corletto testified, the track was removed by mistake and was replaced before CaterParrott began operations. Similarly, CaterParrott initiated the process of removing the asphalt from the crossings so that it could properly serve its customers. "The mere fact that one does not immediately begin to exercise his right of use under

an easement, or that he delays doing so for a number of years, would not occasion a loss of the easement."  Owens Hardware Co. v. Walters, 80 S.E.2d 285, 288 (Ga. 1954).  Brief periods of nonuse, when coupled with active leases and steady improvements to the line, do not suggest an intent to abandon.

The word "unequivocal," used so often by Georgia courts to describe the intent required to abandon an express easement, is defined as "unambiguous; clear; free from uncertainty."  Unequivocal, Black's Law Dictionary (11th ed. 2019).  CGA's actions create significant uncertainty regarding the intent to abandon allegedly expressed in its Notice of Exemption.  Because CGA never relinquished control over the line east of MP-65.80, the court determines that CGA's actions weigh heavily against a finding of abandonment.

## IV.  CONCLUSION

The Federal Circuit asked this court to consider "whether or when the Railroad would have abandoned the portion of its rail line east of milepost E-65.80 absent the August 2013 NITU."  Hardy VI, 959 F.3d at 1350.  To realistically envision a world without this NITU, the court looked beyond the NITU to CGA's other Surface Transportation Board filings, CGA's own explanation of its intent, and CGA's consistent efforts to maintain control over the line.  Having done so, the court determines that in the absence of the NITU, CGA would not have abandoned the portion of the line at issue.  Consequently, defendant is not liable for a taking of the MP-65.80 parcels.  The court therefore **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiffs' motion for summary judgment.  The claims related to the MP-65.80 parcels are **DISMISSED**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge