# In the United States Court of Federal Claims

No. 14-388L

(Filed: December 17, 2021)

```
*************************************
WILLIAM C. HARDY & BERTIE ANN         *
HARDY et al.,                         *
                                      *
              Plaintiffs,             *   Uniform Relocation Assistance and Real
                                      *   Property Acquisition Policies Act;
       v.                             *   Unsuccessful Claims; Reasonableness of
                                      *   Fees and Costs
THE UNITED STATES,                    *
                                      *
              Defendant.              *
*************************************
```

Elizabeth A. Gepford McCulley, Kansas City, MO, for plaintiffs.

David A. Harrington, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Senior Judge

Before the court is plaintiffs' motion for an award of attorneys' fees and costs under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("URA"). As explained below, the court grants plaintiffs' motion in part, awarding $1,553,202.31 in fees and $421,836.85 in costs.

### I.   BACKGROUND

Plaintiffs in this rails-to-trails action own real property adjacent to railroad rights-of-way in Newton County, Georgia. Defendant authorized the conversion of the railroad rights-of-way into recreational trails pursuant to the National Trail Systems Act, conduct that resulted in a taking in violation of the Just Compensation Clause of the Fifth Amendment to the United States Constitution. Of the 173 parcels at issue in this case, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") affirmed defendant's liability for a taking with respect to 145 of them. As for the remaining parcels, this court determined that defendant was not liable for a taking. Seventeen of these parcels were owned in fee simple by the railroad. The other eleven parcels did not satisfy the causation rule laid out in Caquelin v. United States, 959 F.3d 1360 (Fed. Cir. 2020).[1] Reaching this outcome required extensive litigation by the parties and

---

[1] Because these eleven parcels lie east of milepost 65.80, the court refers to them as the "MP-65.80 parcels."

numerous decisions from this court and the Federal Circuit.[2] The proceedings also included a valuation trial, held in Atlanta, Georgia, from September 25, 2017, to October 4, 2017.

When it became apparent that the parties would be unable to reach an agreement regarding an award of litigation expenses under the URA, plaintiffs filed a motion for attorneys' fees and costs. The motion concerns the fees and costs plaintiffs incurred from February 7, 2014, through October 30, 2020.[3] Pls.' Mot. 7. The parties briefed the motion, but defendant subsequently filed a motion to strike plaintiffs' reply. Defendant contended, in part, that plaintiffs had improperly filed new evidence with their reply. The court denied defendant's motion but allowed defendant to file a surreply addressing the new evidence. Neither party requested oral argument, and the court finds it unnecessary. This motion is now fully briefed and ripe for adjudication.

## II.  STANDARDS FOR DECISION

The URA waives federal sovereign immunity with respect to litigation expenses in takings cases. 42 U.S.C. § 4654(c). It mandates that when awarding a plaintiff compensation for a taking by a federal agency, the court shall "reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding." Id. Only prevailing parties may recover under the URA. Otay Mesa Prop., L.P. v. United States, 124 Fed. Cl. 141, 146 (2015), appeal dismissed, No. 16-1438 (Fed. Cir. Mar. 21, 2016).

Plaintiffs bear the burden of documenting their entitlement to a fee award. Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). This burden is generally satisfied through the submission of invoices and billing records. Haggart v. United States, 149 Fed. Cl. 651, 658-59 (2020) (citing Rumsey v. Dep't of Justice, 866 F.3d 1375, 1379 (Fed. Cir. 2017)), modified on reconsideration of other issues by 151 Fed. Cl. 58 (2020). Such documentation must provide "sufficient detail" to allow the court "to determine whether the hours, fees, and expenses are reasonable for any individual item invoiced." Preseault v. United States, 52 Fed. Cl. 667, 679 (2002). Trial courts ultimately exercise "considerable discretion" when evaluating the requested hours, rates, and costs. Stimson Lumber Co. v. United States, 154 Fed. Cl. 694, 701 (2021) (quoting Bywaters v. United States, 670 F.3d 1221, 1228 (Fed. Cir. 2012)), appeal docketed, No. 22-1201 (Fed. Cir. Nov. 30, 2021). This discretion is supported by the trial court's "superior

---

[2] The reported decisions include Hardy v. United States ("Hardy I"), 127 Fed. Cl. 1 (2016), aff'd in part, vacated in part, & remanded, Hardy v. United States ("Hardy VI"), 965 F.3d 1338 (Fed. Cir. 2020); Hardy v. United States ("Hardy II"), 129 Fed. Cl. 513 (2016); Hardy v. United States ("Hardy III"), 131 Fed. Cl. 534 (2017); Hardy v. United States, 138 Fed. Cl. 344 (2018); Hardy v. United States, 141 Fed. Cl. 1 (2018); Hardy v. United States, 153 Fed. Cl. 287 (2021); and Hardy v. United States, No. 14-388L, 2021 WL 4839907 (Fed. Cl. Oct. 18, 2021).

[3] Plaintiffs explain that they chose the October 30, 2020 cut-off date "because that is when the briefing started on the 11 parcels east of MP 65.80 after the Federal Circuit's remand." Pls.' Reply 6; accord Pls.' Mot. 7.

understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." Hensley, 461 U.S. at 437.

### III. DISCUSSION

#### A. Attorneys' Fees

To begin, plaintiffs seek $2,005,360.50 in attorneys' fees, Pls.' Mot. 4, to which defendant raises three principal objections.[4]  First, defendant asserts that plaintiffs' counsel improperly billed for time spent on unsuccessful claims. Def.'s Resp. 9-13. Second, defendant contends that a variety of the other requested fees are not allowed by law. Id. at 13-25. Third, defendant avers that the hourly rates requested for some of plaintiffs' attorneys are unreasonable. Id. at 25-29. Defendant thus argues that the court should award plaintiffs no more than $671,375.52 in fees. Id. at 8 & n.4.

"In determining the amount of reasonable attorneys' fees under federal fee-shifting statutes, the Supreme Court has consistently upheld the lodestar calculation as the 'guiding light of [its] fee-shifting jurisprudence.'" Bywaters, 670 F.3d at 1228-29 (quoting Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551 (2010)). The lodestar method multiplies the number of hours reasonably expended in the case by a reasonable hourly rate. Id. at 1225-26. Courts recognize a "strong presumption" that the lodestar represents a reasonable fee. Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986); accord First Fed. Sav. & Loan Ass'n of Rochester v. United States, 88 Fed. Cl. 572, 587 (2009).

#### 1. Hourly Rates

The court will first determine the appropriate billing rates of plaintiffs' attorneys and paralegals. The relevant reasonable hourly rates are those "prevailing market rates in the relevant community." Blum v. Stenson, 465 U.S. 886, 895 (1984); accord Raney v. Fed. Bureau of Prisons, 222 F.3d 927, 938 (Fed. Cir. 2000). "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum, 465 U.S. at 895 n.11. To determine a reasonable hourly rate, a court may reference other attorneys' declarations concerning rates in a particular locality and may use its own expertise to determine relevant prevailing rates. Stimson, 154 Fed. Cl. at 702 (citing Haggart, 149 Fed. Cl. at 659).

As an initial matter, the parties agree that Kansas City, Missouri is the "relevant community" for purposes of determining reasonable billing rates. See Pls.' Mot. 17-22; Def.'s

---

[4] Defendant inexplicably asserts that plaintiffs' total fee request is $2,003,720.50 rather than $2,005,360.50, leading to minor discrepancies when defendant proposes percentage reductions. See Def.'s Ex. A at 3. When calculating its own percentage reductions, the court will use $2,005,360.50 as its starting point. When discussing defendant's proposal, the court will use $2,003,720.50 as defendant's starting point.

Resp. 27-29. Instead, their dispute concerns the "prevailing market rates" in Kansas City, Missouri and, specifically, the rates of Thomas S. Stewart and Elizabeth A. Gepford McCulley from April 4, 2015, to October 30, 2020. Plaintiffs organize their rate requests into two time periods. For work conducted from February 7, 2014, to April 3, 2015, while plaintiffs' attorneys were part of the law firm of Baker, Sterchi, Cowden & Rice, LLC, plaintiffs request the following hourly rates: $475 for Mr. Stewart, $400 for Ms. McCulley, $350 for Michael J. Smith, and $175 per hour for two paralegals. Pls.' Mot. 17. For work conducted from April 4, 2015, to October 30, 2020, after the attorneys had formed the law firm of Stewart, Wald & McCulley, LLC, plaintiffs request higher rates of $595 per hour for Mr. Stewart and $495 per hour for Ms. McCulley.[5] Id. at 18.

In support of these rate requests, plaintiffs submit a declaration by Mr. Stewart describing his, Ms. McCulley's, Mr. Smith's, and the paralegals' respective experience and qualifications. Pls.' Ex. C (Thomas S. Stewart Declaration). Additionally, plaintiffs submit statements, in the form of two declarations and one affidavit, from three practitioners in the Kansas City, Missouri area that support plaintiffs' requested rates. Pls.' Ex. D (Affidavit of Richard H. Ralston); Pls.' Ex. E (Declaration of Barrett J. Vahle); Pls.' Ex. F (Declaration of Robert Thompson).[6] These local practitioners attest that the prevailing market rates ranged from approximately $400 to $865 for counsel with experience equivalent to Mr. Stewart and Ms. McCulley. Ralston Aff. ¶¶ q, t (stating that the Missouri Supreme Court recognized the lodestar rate of $650 per hour for lead counsel in certain actions and between $400 and $500 per hour for less experienced attorneys); Vahle Decl. ¶ 4 (listing rates of $645 to $865 per hour for partners and $375 to $475 per hour for associates); Thompson Decl. ¶ 5 (listing rates of $475 to $625 per hour for attorneys with twenty-five years or more of experience and $400 to $450 per hour for attorneys with less than twenty years of experience). All three local practitioners conclude that the rates plaintiffs seek are within the range of prevailing rates for Kansas City, Missouri. Ralston Aff. ¶ u; Vahle Decl. ¶ 3; Thompson Decl. ¶ 6. In response, defendant cites a 2016 survey from Missouri Lawyers Weekly which states that the average rate for a partner-level attorney in Kansas City, Missouri was $411 per hour. See Def.'s Resp. 26; Def.'s Ex. C at 5.

This court finds that plaintiffs have provided sufficient evidence that the requested rates for both time periods are reasonable, satisfying their evidentiary burden. Both Mr. Stewart and Ms. McCulley have significant litigation experience, specifically in the area of rails-to-trails

---

[5] As discussed below, defendant's arguments focus on the more recent rates of Mr. Stewart and Ms. McCulley. Plaintiffs did not include Mr. Smith in the second set of rates, and the paralegals' rates remained unchanged between the two periods. See Pls.' Mot. 21. In its response, defendant states generally that plaintiffs request "excessively high hourly rates"; however, defendant does not object to the rates for February 7, 2014, to April 3, 2015. In fact, defendant adopts those rates in its "Attorneys' Fees Adjustments Spreadsheet." See Def.'s Ex. B.

[6] Mr. Vahle and Mr. Thompson both titled their statements as declarations. Mr. Ralston titled his statement as an affidavit. For the purposes of resolving the issues presently before the court, these variations in the local practitioners' statements are immaterial.

cases, which justify their rates. Mr. Stewart is the Senior Attorney at Stewart, Wald & McCulley LLC with approximately forty-two years of litigation experience and has litigated or is litigating around forty rails-to-trails cases in this court. Stewart Decl. ¶¶ 2, 7-8. Ms. McCulley is a founding member of Stewart, Wald & McCulley, LLC with over twenty years of litigation experience and has also worked on a large number of rails-to-trails cases in this court. Id. ¶ 3. This type of specialized experience in such a niche area of law weighs in favor of plaintiffs' counsel's hourly rates. See Gregory v. United States, 110 Fed. Cl. 400, 406 (2013) ("Very few firms in the country have the willingness and the expertise to take on these class action suits against the Government, and this uniqueness is reflected in their billing rates."). Additionally, the local practitioners' statements support plaintiffs' requested rates as those rates all fall within the ranges that the local practitioners provided in their statements.

Other judges on this court have also found these rates to be reasonable. Specifically, in two recent rails-to-trails cases, the courts in Stimson and Haggart upheld Mr. Stewart's rate of $595 per hour and Ms. McCulley's rate of $495 per hour. Stimson, 154 Fed. Cl. at 701-03; Haggart, 149 Fed. Cl. at 665-66. In Stimson, the government's argument opposing the rate was similar to defendant's argument in the present case. There, the government argued that Ms. McCulley's rate of $495 per hour and Mr. Stewart's rate of $595 per hour were unreasonable based on the Wolters Kluwer 2018 Real Rate Report and the 2018 Missouri Lawyers Weekly survey. Stimson, 154 Fed. Cl. at 702 & n.8. It argued instead that the appropriate hourly rates should be $460 for Mr. Stewart and $353 for Ms. McCulley. Id. at 702. However, the court found the government's reference to the Wolters Kluwer report unpersuasive in light of the plaintiff's affidavits. Id. at 703 ("Unlike the rates supported by the local practitioner's declarations, the government's proposed rates are derived from one survey and do not account for Mr. Stewart and Ms. McCulley's experience, specific rates awarded in Missouri under fee-shifting statutes, or the specialized nature of Trails Act cases.").

Similarly, here, the local practitioners' statements account for plaintiffs' counsel's experience and practice area, while the 2016 Missouri Lawyers Weekly survey only states that the average 2015 rate for a partner-level attorney in Kansas City was $411 per hour. See Def.'s Ex. C at 4-5. Moreover, one of the local practitioners references a 2017 publication of the same Missouri Lawyers Weekly survey to reach his conclusion that the requested rates are reasonable, stating that the "prevailing hourly rates for attorneys in the Kansas City and St. Louis metropolitan area[s] are comparable to those requested by [plaintiffs' counsel]." Ralston Aff. ¶ t.

Defendant also argues that plaintiffs' counsel's rate increase violates the "no-interest rule" because the rates must reflect the historical rates for the year when the work was performed and that plaintiffs are not entitled to interest on those rates. Def.'s Resp. 27 (citing Biery v. United States, 818 F.3d, 704, 714 (Fed. Cir. 2016)). This argument is inapposite. Plaintiffs' counsel's rate increase in 2015 corresponded with them forming a new firm—not from applying current or more-recent rates for past work. Mr. Stewart is clear in his declaration that the rates at issue have been the rates of Stewart, Wald & McCulley LLC since 2015. Stewart Decl. ¶¶ 43-44.

In the alternative, defendant argues that the local practitioners' statements in support of the rate increases only apply to work performed after 2017 because, according to defendant, the local practitioners only speak to the reasonableness of the rates as of 2017. Def.'s Resp. 28-29. However, the local practitioners' statements do not support defendant's argument. While Mr. Ralston, a former United States magistrate judge, referenced the 2017 Missouri Lawyers Weekly survey as support for his conclusion, he also stated in his June 2018 statement that, based on his experience of the last five years, plaintiffs' counsel's rates were reasonable. Additionally, both Mr. Ralston and Mr. Thompson cited, inter alia, pre-2017 case law supporting plaintiffs' rate requests. See, e.g., Ralston Aff. ¶ q; Vahle Decl. ¶ 4.

Thus, the court will allow the following hourly rates for plaintiffs' attorneys and paralegals:

| February 7, 2014 – April 3, 2015 | | |
|---|---|---|
| **Timekeeper** | **Hourly Rate Requested** | **Hourly Rate Allowed** |
| Thomas S. Stewart | $475 | $475 |
| Elizabeth McCulley | $400 | $400 |
| Michael J. Smith | $350 | $350 |
| Grant E. Houske | $175 | $175 |
| Jackie Tebbe | $175 | $175 |

| April 4, 2015 – October 30, 2020 | | |
|---|---|---|
| **Timekeeper** | **Hourly Rate Requested** | **Hourly Rate Allowed** |
| Thomas S. Stewart | $595 | $595 |
| Elizabeth McCulley | $495 | $495 |
| Grant E. Houske | $175 | $175 |
| Rosemarie Allen | $175 | $175 |

### 2.  Unsuccessful Claims

Having established the appropriate billing rates for plaintiffs' attorneys and paralegals, the court now considers the hours billed. As an initial matter, defendant asserts that two groups of plaintiffs' claims were unsuccessful and that plaintiffs' requested hours should be correspondingly reduced. First, defendant notes that plaintiffs did not prevail on all claims during the summary judgment liability phase because the court concluded that the railroad owned some of the property in fee simple. Def.'s Resp. 9 (citing Hardy II, 129 Fed. Cl. at 514-15). To account for the seventeen claims that lost at this stage, which make up 9.82% of the total number of claims originally part of this case, defendant proposes a 10% reduction of all hours incurred before the court issued Hardy II. Id. at 12. Second, defendant emphasizes that at the time the parties briefed the instant motion, plaintiffs had not yet prevailed regarding the MP-65.80 parcels. Id. Because these parcels account for 6.36% of the total number of parcels, defendant asks the court to reduce plaintiffs' hours by an additional 6%. Id. Plaintiffs, who initially claimed that "[s]ince the trial was a valuation trial, and all of the Plaintiffs prevailed, there are no 'unsuccessful' claims as a matter of law," Pls.' Mot. 16, respond that if a reduction

is necessary for the seventeen claims that lost at the summary judgment stage, defendant's proposed reduction of 10% is "not anywhere close to accurate," Pls.' Reply 5. Regarding the MP-65.80 parcels, plaintiffs assert that because they request only fees and costs incurred before the postremand briefing began for the causation issues related to those parcels, no additional reductions are necessary. Id. at 6.

When evaluating fees and costs under fee-shifting statutes like the URA, "the most critical factor is the degree of success obtained." Hensley, 461 U.S. at 436. "[H]ours spent on unsuccessful claims should be excluded from the lodestar amount where the claim or claims on which a plaintiff failed to prevail is 'distinct in all respects from his successful claims.'" Bratcher v. United States, 136 Fed. Cl. 786, 793 (2018) (quoting Hensley, 461 U.S. at 440). When making this reduction, the court may exercise its discretion by eliminating specific hours or by lowering the overall award. Hensley, 461 U.S. at 436-37.

Although plaintiffs maintain that "[t]here is simply no way to determine that any portion of the work from the case's inception in 2014 through November 28, 2016 was distinctly and definitely related to the parcels that lost during summary judgment," Pls.' Reply 5, such exactness is not required. In the rails-to-trails context, successful and unsuccessful claims are often distinguished by whether a deed grants to a railroad fee-simple ownership or merely an easement. Thus, "the claims on which Plaintiffs failed to prevail are readily distinguishable from those on which they did prevail, because the unsuccessful claims involve different pieces of property and therefore different property interests." Bratcher, 136 Fed. Cl. at 793. In Gregory, for instance, the court awarded plaintiffs compensation for only 26 of 331 parcels. 110 Fed. Cl. at 403. The court then significantly reduced plaintiffs' requested hours based on the extent to which each category of work was applicable to all parcels. Id. This approach resulted in a 50% reduction for hours spent drafting the pleadings, preparing the motion for class certification, meeting with clients, and conducting initial research; an 80% reduction for hours spent on the claims book, as well as travel, meetings, and research related to individual claims; and a 60% reduction for hours spent on summary judgment filings, oral argument, and plaintiffs' motion for reconsideration. Id. In Bratcher, where approximately 50% of the claims were successful, the court reduced by 40% the hours billed prior to the dismissal of the unsuccessful claims. 136 Fed. Cl. at 793. In Campbell v. United States, approximately 75% of the claims were unsuccessful, leading the court to reduce a portion of the requested hours by 30%. 138 Fed. Cl. 65, 72 (2018). And in Thomas v. United States, the court reduced the applicable requested hours by 23.5% because 47% of the claims were unsuccessful. Nos. 10-54L & 10-459L, 2014 WL 1347221, at *3 (Fed. Cl. Apr. 4, 2014). In declining to reduce the hours further, the court noted the degree of overall success and emphasized that "complex issues . . . were presented in this case, such as defining property lines of a trail located in an urban area and resolving certain boundary disputes." Id.

In accord with these prior decisions, the court finds a reduction of hours necessary, but not one that amounts to "a transposition of the percentage of unsuccessful plaintiffs against the hours charged." See Campbell, 138 Fed. Cl. at 72. The seventeen claims that were unsuccessful at the summary judgment stage correspond to specific parcels that the court determined were owned in fee simple by the railroad rather than held as easements. Hardy II, 129 Fed. Cl. at 514-

15, 518. Each deed, or group of similar deeds, displayed legally significant differences in the amount of consideration exchanged, the presence of a warranty clause, or references to "rights-of-way."[7] Id. at 516. For some of these claims, the court also evaluated whether an intervening public road defeated the claim and whether the railroad had acquired fee simple title through adverse possession. Hardy I, 127 Fed. Cl. at 8. Because these various legal issues can be easily linked to individual claims, the court rejects plaintiffs' assertion that "[t]here is simply no way to determine" a line of demarcation between the successful and unsuccessful claims. See Pls.' Reply 5. The court also recognizes, however, that some of the early research and drafting in this case applied to all claims and would have been necessary even if the unsuccessful parcels had never been part of this litigation. See Gregory, 110 Fed. Cl. at 405 (noting that "much of the research and drafting done during [the pleadings stage] was necessary to the case for later, successful plaintiffs, and should not be discounted entirely"). In sum, although defendant's proposed reduction is overzealous, a reduction is still warranted. The court will reduce the fees sought by plaintiffs for work done prior to Hardy II ($646,054.00) by 5%, resulting in a reduction of $32,302.70.

The MP-65.80 parcels present a slightly different scenario. Here, the parties grappled with the unique question of whether the issuance of a NITU initiates a taking when an incorrect milepost description appears to extend the NITU to more parcels than intended. Hardy III, 131 Fed. Cl. at 536. The court sees little overlap between this question and the legal work necessary to resolve the successful claims. And although plaintiffs claim that the legal work unique to the MP-65.80 parcels did not start in earnest until late 2020, the parties began exploring these issues years ago. The court first directly addressed the NITU's error in Hardy III, its April 13, 2017 opinion on defendant's motion for reconsideration, which the parties thoroughly briefed. Moreover, plaintiffs' counsel's billing records demonstrate that they billed additional time for work on the MP-65.80 parcel causation issues between the Federal Circuit's Hardy VI decision, issued July 15, 2020, and plaintiffs' billing cut-off date of October 30, 2020. E.g., Pls.' Ex. B at 146 (time billed by Grant E. Houske to "research and investigate issues pertaining to remanded temporary take parcels"), 147 (time billed by Mr. Stewart to "[r]eview timeline and chronology concerning causation issue for temporary take parcels and work on draft letter to [defendant's counsel] concerning same"), 153 (time billed by Mr. Stewart to "[r]eview Federal Circuit's Opinion, review research files on causation, and work on outline for summary judgment brief on causation for temporary take parcels east of Milepost 65.80"). For these reasons, the court finds defendant's proposal closer to the appropriate reduction and will reduce plaintiffs' total fees ($2,005,360.50) by 6%, resulting in a reduction of $120,321.63.

---

[7] For summary judgment purposes, the court divided the deeds at issue into three such categories: the Armstrong deed, and deeds substantially similar to it; the Lee deed, and deeds substantially similar to it; and the Robinson and Weaver deeds. Hardy I, 127 Fed. Cl. at 10-15. Later, when adjudicating plaintiffs' motion for reconsideration, the court further differentiated between the various deeds in the Lee group. Hardy II, 129 Fed. Cl. at 518.

### 3. Disallowed Hours

As for plaintiffs' remaining claimed hours, defendant seeks reductions on five additional grounds: that some hours constitute administrative work; that some entries are block billed; that an unreasonable number of hours were billed for travel; that some hours are excessive, duplicative, or otherwise unnecessary; and that hours were improperly billed for representational work or work on other cases. The court addresses each ground in turn.

#### a. Administrative Work

Defendant first asks the court to deduct $337,739.50 from plaintiffs' fee award for administrative or secretarial work that defendant alleges is not compensable under the URA. Def.'s Resp. 13-15; Def.'s Ex. A at 3. This proposed amount includes a 50% reduction of all hours billed by paralegals and a 50% reduction of the 450.3 hours the attorneys billed to work on claims spreadsheets. Id. at 15. As examples of such noncompensable administrative work, defendant points to time spent by plaintiffs' paralegals "collecting, managing, and organizing documents and data, preparing and finalizing documents for filing, and preparing mailings," as well as time spent collecting property owners' names and managing related data. Id. at 14. Plaintiffs maintain that defendant has mischaracterized these paralegal tasks, and that these tasks were reasonable given the paralegals' responsibilities managing over 100 plaintiffs and assisting with the discovery and appraisal processes. Pls.' Reply 8.

Because administrative costs "are more appropriately charged to overhead," they should generally be included in an attorney's hourly rate and not compensated separately. Otay Mesa Prop., L.P., 124 Fed. Cl. at 148 (quoting Hopi Tribe v. United States, 55 Fed. Cl. 81, 99 (2002)). Examples of such administrative or secretarial work include proofreading, assembling, photocopying, and mailing. Biery v. United States, Nos. 07-693L & 07-675L, 2014 WL 12540517, at *4 (Fed. Cl. Jan. 24, 2014) (citing Hopi Tribe, 55 Fed. Cl. at 99). In rails-to-trails proceedings, however, courts have approved reimbursement at paralegal rates for tasks such as managing client data, McCarty v. United States, 142 Fed. Cl. 616, 627 (2019), and inputting parcel information into a software program, Grantwood Vill. v. United States, 55 Fed. Cl. 481, 485 (2003).

The court agrees that some of the paralegal tasks noted by defendant are more accurately characterized as administrative work. Defendant's proposed 50% reduction of paralegal hours, however, is plainly excessive. Moreover, given the number of plaintiffs and parcels involved in this litigation, the court considers some of the time spent maintaining claims spreadsheets to be legitimate paralegal work. The court will reduce plaintiffs' requested paralegal fees ($459,305.00) by 5%, resulting in a reduction of $22,965.25. As for the hours plaintiffs' attorneys spent working on spreadsheets, the court concludes that a more substantial deduction is

warranted. Because this work could easily have been completed by paralegals, the court reduces the 338.9 hours billed for it ($162,068.25) by 50%, resulting in a reduction of $81,034.13.[8]

### b. Block Billing

Because plaintiffs' attorneys and paralegals allegedly block billed many entries, defendant next asserts that their billed hours should be reduced by 10%. Def.'s Resp. 17. Defendant points to several instances where attorneys or paralegals billed a significant number of hours and a wide variety of tasks in a single entry, such as Mr. Houske's entry for 11 hours in December 2014, Pls.' Ex. A at 21, or Mr. Stewart's entry for 3.7 hours in September 2017, Pls.' Ex. B at 89. Def.'s Resp. 16-17. Plaintiffs, in response, contend that courts have not imposed a "general prohibition against block billing, particularly when all the time entries are described with particularity and the time is recorded in tenths of an hour." Pls.' Reply 9.

Block billing involves "lumping tasks together in time entries rather than making such entries task-by-task." McAfee v. Boczar, 738 F.3d 81, 90 (4th Cir. 2013). The Federal Circuit, in the context of patent litigation, has affirmed trial courts' determinations regarding block billing with little commentary. See Raniere v. Microsoft Corp., 887 F.3d 1298, 1309 (Fed. Cir. 2018) (upholding the district court's finding that specific time entries were not block billed); Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd., 726 F.3d 1359, 1369 (Fed. Cir. 2013) (upholding the district court's reduction of block-billed time entries by 75%). Other courts of appeals have upheld a wide range of percentage reductions for block billing. McCarty, 142 Fed. Cl. at 629 (documenting various courts of appeals decisions reviewing awards of attorneys' fees). Above all, the court must consider whether the disputed entries "provide a sufficient level of detail to allow [the court] to effectively review the reasonableness of the claimed hours." McCarty, 142 Fed. Cl. at 629.

The court finds it appropriate to reduce plaintiffs' claimed hours for block billing, but not to the extent proposed by defendant. Over the years spent on this case, plaintiffs' attorneys and paralegals billed time for a wide variety of tasks in four-to-ten-hour increments.[9] E.g., Pls.' Ex.

---

[8] Defendant asserts that plaintiffs' attorneys billed 450.3 hours for work on spreadsheets. Having reviewed the billing records and defendant's proposed line-by-line deductions, the court determines that 338.9 hours is a more accurate number.

[9] One of Mr. Houske's ten-hour entries from December 2014, for instance, includes the following description of his activities:

> Continued and completed work on reviewing, compiling and incorporating deeds, parcel reports and GIS maps into claims books; prepare additional request to Equity Title for deeds needed for claims books; revise draft Second Amended Complaint to include additional entry of appearance claimants; scan, save and mark as exhibit deed and parcel report to file with Second Amended Complaint; prepare additional request to Equity Title for deed; work on reviewing NARA maps, valuation schedules and conveyance deeds to determine which deeds are

A at 19-21; Pls.' Ex. B at 93-94.  Because the court cannot match the amount of time billed to any particular task, evaluating the reasonableness of plaintiffs' requested hours becomes significantly more difficult (or, at times, impossible).  This difficulty is precisely why the practice of block billing has earned "repeated criticism by courts throughout the country."  Banas v. Volcano Corp., 47 F. Supp. 3d 957, 967 (N.D. Cal. 2014).  Thus, the court will reduce plaintiffs' total requested fees ($2,005,360.50) by 5%, resulting in a deduction of $100,268.03.

### c. Unreasonable Travel Fees

Next, noting that plaintiffs seek reimbursement for twenty-five separate trips in relation to this matter, defendant urges the court to reduce the allegedly unreasonable travel fees.  Def.'s Resp. 17.  Defendant views the thirteen separate trips to Covington, Georgia, for which defendant contends plaintiffs' counsel billed 343 hours, as particularly excessive.  Id. at 20.  Defendant also asserts that plaintiffs' counsel improperly billed their full rate for travel time, rather than the 50% reduced rate that the United States Court of Federal Claims has found appropriate.  Id. at 19.  In total, defendant seeks a 25% reduction of the fees plaintiffs incurred for their Covington travel.  Id. at 20.  Plaintiffs insist that each of these trips was necessary to determine which potential plaintiffs had claims, develop the claims book documentation, respond to discovery requests, and collect verified signatures for discovery responses.  Pls.' Reply 11-12.

In addition to time spent traveling to and from proceedings, the court recognizes that some travel for site visits and meetings with out-of-state clients may be reasonable.  Accord Campbell, 138 Fed. Cl. at 72.  During these periods of active travel, plaintiffs' counsel should bill only 50% of the hours spent traveling.  McCarty, 142 Fed. Cl. at 627.  An exception to this rule applies if plaintiffs' counsel can demonstrate that they were "render[ing] legal services en route."  Blissett v. Casey, 969 F. Supp. 118, 134 (N.D.N.Y. 1997); accord Grantwood Vill., 55 Fed. Cl. at 486.

Because the court acknowledges the necessity of in-person meetings with landowners and trail inspections in rails-to-trails cases, particularly in a case with over 100 plaintiffs, the court finds plaintiffs' counsel's thirteen trips to Covington to be reasonable.  However, although it appears that plaintiffs' counsel occasionally conducted legal work while traveling, this does not seem to have been the normal practice.  The court will thus reduce the fees claimed by plaintiffs

---

applicable to each claimants [sic] parcel to be included in Claims Books; begin RR conveyance portion of Claim Book submission process; review NARA maps and ICC schedule with current NITU Parcel maps; research and investigate maps for same and identify applicable RR conveyance for Claims Books; update same on Class Index.

Pls.' Ex. A at 21.

for 219.4 hours of travel ($75,372.50) by 5%, resulting in a reduction of $3,768.63.[10] Additionally, the court will deduct $4,950.00 to account for a clerical error in Ms. McCulley's travel time.[11]

### d. Excessive, Duplicative, or Unnecessary Hours

Defendant further considers many of plaintiffs' counsel's time entries to be excessive, duplicative, or otherwise unnecessary, and thus requests that the court reduce plaintiffs' total requested fees by 20%. Def.'s Resp. 20-23. Emphasizing that the successful claims in this case involved relatively routine chain-of-title and valuation issues, defendant views the frequent intra-office communications and alleged "duplication of effort" among numerous attorneys to be excessive and unreasonable. Id. at 21-22. Plaintiffs, disputing defendant's purported oversimplification of the issues litigated in this matter, assert that defendant's aggressive litigation strategy necessitated the hours billed. Pls.' Reply 13-15.

"[C]ourts ought to examine with skepticism claims that several lawyers were needed to perform a task." Dem. Party of Wash. State v. Reed, 388 F.3d 1281, 1286 (9th Cir. 2004). Plaintiffs may not be reimbursed for duplicative work by multiple attorneys or paralegals, including excessive intra-office meetings or other communications. See O'Neill v. Sec'y of Health & Human Servs., No. 08-243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015) ("Where the use of multiple attorneys is excessive and results in efforts being duplicated, the number of hours should be reduced."); A.J. by L.B. v. Kierst, 56 F.3d 849, 864 (8th Cir. 1995) ("A court may reduce attorney hours, and consequently fees, for inefficiency or duplication of services in cases where more than one attorney is used."). When evaluating whether such tasks are excessive or duplicative, the court considers the "context of the surrounding time entries and the general posture of the litigation corresponding to the date of the entry." Haggart, 149 Fed. Cl. at 665.

Three attorneys and three paralegals billed time in this matter over a six-year period. However, "[p]articipation of more than one attorney does not necessarily amount to unnecessary duplication of effort." Dem. Party of Wash. State, 388 F.3d at 1286. Given the number of claims involved and staffing changes experienced by plaintiffs' counsel, the court does not find these numbers inherently unreasonable. But having reviewed the billing records, the court concludes that a reduction is still warranted for the "planning meetings" billed by all participants. See, e.g., Pls.' Ex. B at 103 (time billed by all participants for meeting between Rosemarie Allen, Mr. Houske, Mr. Stewart, and Ms. McCulley), 122 (same), 126-27 (same). On this basis, the

---

[10] Defendant asserts that plaintiffs billed 343 hours for unnecessary Covington travel. Having reviewed the billing records and defendant's proposed line-by-line deductions, the court determines that only 219.4 hours can be properly ascribed to this travel.

[11] The clerical error was identified by defendant and acknowledged by plaintiffs; it involves the billing of 19.5 hours for travel time from Kansas City, Missouri, to Covington, Georgia, and then to Tifton, Georgia. Def.'s Resp. 20; Pls.' Reply 12 & n.31. The court has reduced Ms. McCulley's time by ten hours.

court will reduce plaintiffs' total requested fees ($2,005,360.50) by 3%, resulting in a reduction of $60,160.82.

### e. Hours Billed for Representational Work or Work on Separate Cases

Finally, defendant contends that plaintiffs' counsel improperly billed for representational work and work on separate cases. Def.'s Resp. 23. Defendant notes that plaintiffs' counsel billed for time spent resolving representation disputes with another firm in relation to Jackson v. United States, No. 14-397L, which it characterizes as an unrelated case. Id. at 23-24. Furthermore, defendant points out that plaintiffs' counsel billed 13.6 hours for Ms. McCulley to attend an oral argument in Jackson. Id. at 23-24. For these alleged errors, defendant asks the court to cut a total of 92.2 hours from plaintiffs' award. Id. at 25. Plaintiffs, in contrast, maintain that because it involves the same trail and original conveyance deeds as Hardy, Jackson is a directly related case and the time spent on it was necessary. Pls.' Reply 15-16. At the same time, plaintiffs admit that "some of the hours related to the 'representational' work on potential conflicts, even though they were necessary and resulted in significant judicial economies, . . . [could] not have been charged directly to clients" under normal circumstances. Id. at 16.

"Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." Hensley, 461 U.S. at 434. Accordingly, time spent resolving representational issues or working on unrelated matters is not compensable. Campbell, 138 Fed. Cl. at 71 (denying compensation for time spent soliciting new clients); Naplesyacht.com, Inc. v. United States, No. 04-252C, 2005 WL 6112642, at *10 (Fed. Cl. Mar. 31, 2005) (denying compensation for time spent on proceedings before the Government Accountability Office). Here, the court agrees with defendant that it was unreasonable for plaintiffs' counsel to bill for travel to Washington, D.C. to attend an oral argument in Jackson. But the court finds that defendant has overstated the number of hours plaintiffs request for representational work and other tasks related to Jackson. See Def.'s Ex. B (documenting the hours defendant classifies as related to Jackson). After reviewing the billing records, the court identifies only 76.7 hours that can be ascribed to such noncompensable tasks. Thus, the court reduces plaintiffs' claimed time by a total of 76.7 hours for representational work or work on unrelated matters, resulting in a reduction of $26,387.00.

### 4. Fees Summary

In summary, the court partially awards plaintiffs' requested fees as follows:

|  | **Defendant's Proposal (using plaintiffs' rates)** | **Court's Resolution** |
|---|---|---|
| Total Amount Requested | $2,003,720.50 | $2,005,360.50 |
|  |  |  |
| Unsuccessful Claims | -$184,828.63 | -$152,624.33 |
| Administrative Work | -$337,739.50 | -$103,999.38 |
| Block Billing | -$200,372.05 | -$100,268.03 |
| Travel | -$36,553.50 | -$8,718.63 |
| Duplicative/Excessive | -$400,744.10 | -$60,160.82 |
| Representational/Unrelated Work | -$30,947.00 | -$26,387.00 |
|  |  |  |
| Total Reduction | -$1,191,184.78 | -$452,158.19 |
| Total Award | $812,535.72 | $1,553,202.31 |

### B. Costs

In addition to their fee request, plaintiffs seek $481,248.10 in costs, covering expert witness fees, travel, overhead, and printing and shipping expenses. Pls.' Mot. 26. Defendant does not challenge the $258,538.85 that plaintiffs request for their expert witnesses. Def.'s Resp. 29-30. Defendant objects to plaintiffs' other requested costs, however, and maintains that the court should award plaintiffs no more than $398,426.11 in total costs.[12] Def.'s Surreply 9.

### 1. Travel

Defendant first takes issue with many of plaintiffs' requested travel-related expenses. Specifically, defendant claims that several of the trips taken by plaintiffs' counsel were not justified and that some of the airfare and hotel charges are unreasonably high. Def.'s Resp. 30-32. Defendant also contends that certain claimed travel expenses are duplicative, unexplained, unrelated to this case, or unreasonable. Id. at 33-36. Defendant thus seeks $17,096.49 in

---

[12] Defendant proposes two potential amounts for reimbursable costs: $280,411.98, which includes deductions for unsubstantiated costs, or $398,426.11, which includes deductions only for unreasonable expenses. Def.'s Surreply 9; see also Def.'s Resp. 30 (explaining the distinction between defendant's two cost reimbursement proposals). Because the calculations in defendant's response are based on the higher number, Def.'s Ex. F at 6, the court will use $398,426.11 as defendant's proposed maximum amount for reimbursable costs. Additionally, the court notes that this proposed amount seems to be based on a small miscalculation: Defendant states that plaintiffs requested $480,701.18 in total costs when plaintiffs actually requested $481,248.10 in total costs. See id.; Pls.' Mot. 26.

specific itemized deductions and a 30% reduction of the remaining travel-related costs.[13] Def.'s Ex. F at 2. Plaintiffs concede that some of defendant's proposed itemized deductions are at least partially valid and acknowledge that a small reduction for unreasonably high airfare charges may be appropriate. Pls.' Reply 24-27. However, plaintiffs assert that defendant's other proposed reductions "have no merit." Id. at 24.

Evaluating the reasonableness of plaintiffs' counsel's myriad travel-related charges is ultimately more of a factual inquiry than a legal one. Although plaintiffs object broadly to defendant's proposed reductions, they do not directly address the vast majority of them. Noting that defendant opposes reimbursement of charges related to airline ticket revision fees, plaintiffs state: "[O]ver the course of 7 years, Plaintiffs' counsel's travel agents did make dozens and dozens of changes to Plaintiffs' counsel's flights for the 25 trips enunciated in Plaintiffs' brief and, frankly, the charges for all of those changes were necessary and reasonable." Id. at 26. This statement does not explain why "dozens and dozens of changes" were necessary, and consequently, the court cannot find these expenses to be reasonable. Plaintiffs also acknowledge that their counsel billed $1,443.60 for a trip that was canceled due to the COVID-19 pandemic and indicate that their counsel is prepared to "absorb this expense if necessary." Id. As for defendant's other proposed line-item deductions, including travel agent fees, the court agrees that these charges are either unreasonable or simply insufficiently documented to merit recovery. The court will deduct $17,096.49 for these expenses—the full amount requested by defendant. Similarly, the court finds that a significant across-the-board reduction is necessary for plaintiffs' other travel expenses. The documentation plaintiffs belatedly supplied with their reply substantiates less than half of their travel expenses, see Pls.' Ex. B-2, and the court agrees with defendant that the inflated hotel and airfare costs for these trips are unreasonable. The court therefore reduces plaintiffs' remaining claimed travel expenses ($122,790.52) by 15%, resulting in a reduction of $18,418.58.[14]

---

[13] Plaintiffs submitted supplemental documentation of their travel expenses with their reply. Pls.' Ex. B-2. Defendant claims that "rather than establishing the reasonableness of all such costs, Plaintiffs' documentation demonstrates that Plaintiffs' claimed costs are unreasonable." Def.'s Surreply 5. Specifically, defendant raises concerns regarding the high amounts requested for hotel rooms, room service, and hotel laundry services. Id. at 5-7. Defendant does not add any of these expenses to its list of itemized deductions, but instead suggests that the court should consider them when evaluating defendant's request for a 30% reduction of overall travel costs. See id. at 7 ("In its response, the United States applied a 30% deduction to account for excessive travel and exorbitant costs. The evidence in Exhibit B-2 confirms that such a deduction is, if anything, too low.").

[14] Plaintiffs do not provide an amount for their total travel-related expenses. Combining the expenses from plaintiffs' counsel's former and current firms, defendant posits that plaintiffs' travel-related expenses total either $141,953.27, Def.'s Resp. 30 n.22, or $139,887.01, Def.'s Ex. F at 2. Defendant does not explain this discrepancy. Because defendant's proposed reductions appear to be based on the lower amount, and based on its own review of the records, the court will use $139,887.01 for its calculations as well. The court calculates its reduction by subtracting the line-item deductions and travel agent fees, then reducing the remainder by 15%.

## 2. Overhead

Defendant next maintains that plaintiffs' costs should be reduced by $10,286.38 because plaintiffs should not be reimbursed for "overhead costs" such as office supplies, legal research, and PACER fees. Def.'s Resp. 36-38. Plaintiffs justify these costs by stating that "the research fees were for hours actually attributable to legal research on this particular case and the office supplies were purchased specifically for trial." Pls.' Reply 27.

The costs of online legal research may be reimbursed if they are the kind of expenses that are "typically billed to paying clients." Ciapessoni v. United States, 145 Fed. Cl. 564, 565 (2019). Courts are often reluctant to reimburse plaintiffs for using legal search engines like Westlaw and Lexis, since firms frequently pay a flat rate for these services regardless of their actual usage. Bratcher, 136 Fed. Cl. at 801-02 (citing Biery, 2014 WL 12540517, at *8). Flat-rate payments of this kind may not be reimbursed as out-of-pocket expenses. Carpenters Health & Welfare Fund v. Coca-Cola Co., 587 F. Supp. 2d 1266, 1273 (N.D. Ga. 2008). Thus, to receive reimbursement for such legal research expenses, plaintiffs must carefully document the payment and the reason the services were necessary. See Ciapessoni, 145 Fed. Cl. at 565 (reimbursing PACER fees); Roberts v. Sec'y of Health & Human Servs., No. 16-1151V, 2018 WL 2772304, at *4 (Fed. Cl. Spec. Mstr. May 18, 2018) (declining to reimburse a charge for "PACER service center" because the plaintiff "could not provide documentation to support that expense"). As defendant emphasizes, Def.'s Resp. 36-37, plaintiffs provide no documentation to support the Westlaw, Lexis, or PACER charges. Because plaintiffs have not established that this case required unique legal research expenses for which flat-rate services or standard free access to filings would not suffice, the court declines to reimburse these expenses.

Expenses related to office supplies should generally be covered by an attorney's hourly rate, and reimbursement for them is "routinely denied as overhead." Hopi Tribe, 55 Fed. Cl. at 100; see also Sheffer v. Experian Info. Sol., Inc., 290 F. Supp. 2d 538, 552 (E.D. Pa. 2003) (denying compensation for office supplies used at trial); Pigford v. Vilsack, 89 F. Supp. 3d 25, 36 (D.D.C. 2015) (denying compensation for unspecified office supplies purchased from Staples); Tipton v. Sec'y of Health & Human Servs., No. 16-303V, 2017 WL 7791110, at *5 (Fed. Cl. Spec. Mstr. Oct. 23, 2017) (noting that "[t]he cost of office supplies such as paper, pens, labels, and CDs has been disallowed as overhead expenses"). Plaintiffs provide dates, amounts, and retailers of the office supply purchases, but they do not provide receipts or indicate what was purchased. Pls.' Ex. B at 12. Due to the lack of documentation establishing that these expenses are not attributable to normal office overhead, the court will not reimburse these expenses.

In short, the court will deduct $10,286.38 for these overhead costs—the full amount requested by defendant.

## 3. Printing and Shipping

Lastly, defendant contends that many of plaintiffs' requested printing and shipping costs are improper or insufficiently documented. Def.'s Surreply 3-5. First, defendant notes that some

of the purported trial-related printing costs, which were handled by outside vendors rather than the firm's staff, were actually incurred long before or after trial. Id. at 3-4. Defendant thus considers these costs to be noncompensable law-firm overhead. Id. at 4. Second, defendant similarly claims that some of the shipping expenses do not correspond to actual trial dates and locations. Id. Third, defendant indicates that much of the purported printing, copying, and shipping costs is not supported by receipts or other appropriate documentation. Id. at 4-5. Overall, defendant seeks a reduction in plaintiffs' claimed printing and shipping costs of $18,055.04. Id. at 5. Plaintiffs maintain that these costs were incurred in preparation for trial, emphasizing that many of the disputed costs were paid to outside vendors between February 1, 2017, and September 25, 2017, for trial exhibits. Pls.' Reply 27.

Printing and photocopying "fall within those 'reasonable and necessary expenses' which are 'customarily charged to the client where the case is tried.'" Haggart, 149 Fed. Cl. at 666 (quoting Oliveira v. United States, 827 F.2d 735, 744 (Fed. Cir. 1987)). Plaintiffs, however, must still substantiate these charges with proper documentation showing their necessity. R.C. Constr. Co. v. United States, 42 Fed. Cl. 57, 63-64 (1998). Here, plaintiffs have neglected to document $7,988.63 of their printing and copying charges, Def.'s Surreply 4-5, which the court, accordingly, cannot reimburse. Defendant also objects to plaintiffs' request that the court reimburse them for the cost of printing their Federal Circuit appellate brief. Id. at 8; Pls.' Ex. B-3 at 21. The court agrees with defendant that plaintiffs may not be reimbursed for appellate costs, particularly since the Federal Circuit explicitly ordered in Hardy VI that costs related to that proceeding would not be awarded. 965 F.3d at 1350; see also Otay Mesa Prop., L.P. v. United States, 127 Fed. Cl. 146, 151 (2016) (refusing to reimburse plaintiffs for costs of printing and filing appellate briefs because "the Federal Circuit ordered that each party should bear its own costs on appeal"). The court will deduct the $1,210.00 plaintiffs seek for this expense as well. The remaining disputed expenses are purportedly related to the trial, but the court again agrees with defendant that plaintiffs have not sufficiently explained why their counsel incurred these expenses both after and significantly in advance of the trial, or why the work had to be completed by outside vendors at a price premium. Thus, the court reduces the remaining amount requested ($24,434.70) by 10%, resulting in a total reduction of $11,642.10.[15]

Defendant's objections to plaintiffs' requested shipping charges also have some merit. Postage is generally a reimbursable expense, "assuming [the charges] are documented and reasonably necessary to prosecution of the claim." R.C. Constr. Co., 42 Fed. Cl. at 63-64; see also Halverson v. Sec'y of Health & Human Servs., No. 15-227V, 2021 WL 2768339, at *4 (Fed. Cl. Spec. Mstr. May 25, 2021) (denying reimbursement of United Parcel Service ("UPS") costs for which invoices were not provided). For expedited delivery services in particular,

---

[15] Plaintiffs do not provide an amount for their total printing expenses. Combining the expenses from plaintiffs' counsel's former and current firms, defendant states that plaintiffs' printing expenses total $33,633.33, which is confirmed by a review of the records. Def.'s Ex. F at 5. The court calculated its reduction by subtracting the undocumented charges ($7,988.63) and the printing expenses for plaintiffs' appellate brief ($1,210.00) from this amount, then deducting 10% of the remainder.

plaintiffs must provide enough information to "allow the Court to determine what documents were transmitted and to whom, and whether the use of the expedited delivery service was reasonable or necessary, as opposed to merely convenient for counsel." Bratcher, 136 Fed. Cl. at 801.

Despite the ample opportunity the court gave plaintiffs to substantiate these charges, plaintiffs have not provided adequate documentation for $1,486.91 of their requested shipping costs. The court cannot reimburse these expenses absent the required documentation. As for the remaining $4,807.93, the court finds that some additional reductions are warranted. Plaintiffs frequently incurred charges for next-day shipping, without explaining why such expedited delivery was necessary. See, e.g., Pls.' Ex. B-4 at 2-3 (UPS "Next Day Air Saver Commercial" charges invoiced in August 2016), 6-7 (UPS "Next Day Air Early Commercial" charges invoiced in September 2016), 10 (UPS "Next Day Air Early" charges invoiced in May 2017). And despite plaintiffs' claim that the shipping costs were related to the Atlanta, Georgia trial held in September and October 2017, Pls.' Reply 27, a number of these shipments were sent to other locations on other dates. See, e.g., Pls.' Ex. B-4 at 3 (shipment to Evansville, Indiana, on August 22, 2016), 6 (shipment to Seattle, Washington, on August 26, 2016), 10 (shipment to Atlanta, Georgia, on May 8, 2017).[16] Because plaintiffs incurred shipping costs at higher rates than their records suggest was necessary, and because they have not properly explained the necessity of some shipping costs that were not trial-related, the court will reduce the remaining shipping costs ($4,807.93) by 10%, resulting in a total reduction of $1,967.70.[17]

---

[16] The Evansville, Indiana shipments were addressed to David Matthews, plaintiffs' expert. Pls.' Ex. B-4 at 3. The Seattle, Washington shipments were addressed to another law firm. Id. at 6. That firm's relation to this case is unclear. The Atlanta, Georgia shipments appear to be addressed to plaintiffs' counsel, Mr. Stewart, while he was staying in Atlanta for a site visit, witness interviews, and a deposition. Id. at 10; Pls.' Ex. B at 61.

[17] Plaintiffs do not provide an amount for their total shipping expenses. Combining the expenses from both plaintiffs' counsel's former and current firms, defendant indicates that plaintiffs' shipping expenses total $6,294.84, which is confirmed by a review of the records. Def.'s Ex. F at 5. The court calculated its deduction by subtracting the undocumented charges ($1,486.91) from this amount, then deducting 10% of the remainder.

#### 4. Costs Summary

In summary, the court partially awards plaintiffs' requested costs as follows:

|  | **Defendant's Proposal** | **Court's Resolution** |
|---|---|---|
| Amount Requested | $480,701.18 | $481,248.10 |
|  |  |  |
| Travel | -$53,933.65 | -$35,515.07 |
| Overhead | -$10,286.38 | -$10,286.38 |
| Printing/Shipping | -$18,055.04 | -$13,609.80 |
|  |  |  |
| Total Reduction | -$82,275.07 | -$59,411.25 |
| Total Award | $398,426.11 | $421,836.85 |

## IV.  CONCLUSION

As set forth above, plaintiffs' motion for attorneys' fees and costs is **GRANTED IN PART** and **DENIED IN PART**.  The court awards plaintiffs litigation expenses in the amount of $1,975,039.16, consisting of $1,553,202.31 in attorneys' fees and $421,836.85 in costs.  The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney  
MARGARET M. SWEENEY  
Senior Judge